IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 5, 2026

## IN RE VIOLET L.[1]

**Appeal from the Juvenile Court for Shelby County**
**No. GG3333W. Ray Glasgow, Magistrate**

_____

**No. W2025-00982-COA-R3-PT**

_____

Mother appeals the termination of her parental rights. The trial court found multiple grounds for termination and that termination of Mother's parental rights was in the children's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which CARMA DENNIS MCGEE and KRISTI M. DAVIS, JJ., joined.

Julius Besser, Memphis, Tennessee, for the appellant, Anna L.

Jonathan Skrmetti, Attorney General and Reporter, and Clifton W. Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.

Violet L. was born in January 2022 to Anna L. (Mother). Christopher J.[2] (Father) was later confirmed as the child's biological father through DNA testing in October 2022, although he was not listed on the child's birth certificate. Mother also had two older children from previous relationships, though she did not have custody of them. For much

---

[1] It is the policy of this court to protect the privacy of children in parental termination cases by avoiding the use of full names.

[2] Father's parental rights were also terminated by the trial court's final order. He has not filed an appeal.

of her adult life, Mother has struggled with alcohol dependency and housing instability. She also has a decade plus history of involvement in abusive relationships. The trial court ultimately terminated the parental rights of both Mother and Father. Father did not appeal the trial court's order; Mother did appeal. Accordingly, only Mother's parental rights are before this Court on appeal.

On February 1, 2023, the Tennessee Department of Children's Services (DCS) received a referral alleging that the then one-year-old Violet was drug-exposed. The referral indicated that Mother was observed carrying the child around an apartment complex while highly intoxicated, erratic, and incoherent. Later that day, law enforcement and child protective services personnel located Mother at a hospital. Officers were informed that Mother had slipped and fallen on a patch of ice in the parking lot of the apartment complex while carrying the child. Fortunately, the child was unharmed and cleared by medical staff for release. However, due to her condition, Mother was involuntarily and temporarily committed to a mental health institution. Father was incarcerated at the time. With no relatives available to assume care, the child was placed into the protective custody of DCS and subsequently transitioned to the foster home of Catherine N. (Foster Mother).

On October 31, 2023, Violet was adjudicated dependent and neglected. The court found the child was a "victim of improper guardianship that results from the consequences of [Mother's] alcohol dependency and misuse, inadequate parenting, and exposure to an unsafe environment and housing instability." During these proceedings, the juvenile court noted its concern over Mother's inability to acknowledge how her drinking and instability contributed to the situation, observing that Mother instead blamed law enforcement for her previous three convictions for driving under the influence.

Initially, following Violet's placement with Foster Mother, Mother demonstrated a desire to maintain a relationship with Violet. She visited consistently throughout 2023, providing diapers and wipes and bringing snacks and toys for the child in December 2023 and January 2024. However, Mother also began exhibiting signs of severe psychological distress. She sent erratic and troubling communications to both DCS and Foster Mother. Mother threatened to commit suicide. She also claimed her phone was being hacked, insisted her apartment was being watched, and expressed beliefs that someone was tracking the Foster Mother's exact latitude and longitude.

Mother's visits with the child ceased after January 22, 2024. Following her final visit in January 2024, Mother's circumstances worsened. She lost her housing and became homeless around Easter of 2024. Mother was subsequently the victim of a physical assault and stabbing in May 2024. During the summer of 2024, despite knowing the child remained in foster care, Mother engaged in a series of burglaries. She broke into the home of a DCS family support worker who was away on vacation. Attempting to explain her actions, Mother stated, "[T]he window was open, it was hot, I was starving, I didn't know

what to do, and my body took over my mind and collapsed." Mother showered in the residence, consumed the worker's food and beer, slept on his couch, and stole several items, including a laptop, blanket, pillow, suitcase, and identification. She later returned to the property, while intoxicated, to apologize, but while she was there, she urinated near the front door. On July 19, 2024, Mother unlawfully entered another private duplex and stole property. Shortly thereafter, she stole property from a local high school.

As a result of these actions, Mother was charged with theft of property and aggravated burglary. She was arrested and incarcerated on August 15, 2024. At the time of her arrest, Mother had not visited or provided financial support to the child since January 22, 2024. Citing this prolonged absence and her criminal behavior, DCS filed a petition to terminate Mother's and Father's parental rights on October 9, 2024.

While Mother remained incarcerated, the General Sessions Criminal Court ordered her to undergo a forensic evaluation. Mother was admitted to a mental health institute on October 29, 2024 in order to assess her competency to stand trial and evaluate her for diminished capacity regarding her pending criminal charges. Following the evaluation, staff concluded that Mother possessed the present ability to consult with her attorney, that she understood the proceedings against her, and that there was no basis to conclude she had diminished capacity. Finding she did not meet the standards for judicial commitment, she was discharged back to the custody of the Shelby County Jail on November 26, 2024.

In January 2025, Mother pled guilty to charges of theft of property and aggravated burglary. As a condition of her plea agreement, Mother was released from jail in January 2025 to participate in an 18-month recovery program through the Shelby County Drug Court. She initially entered the residential treatment phase at the Cocaine and Alcohol Awareness Program and subsequently transitioned to an extended sober living facility. Her recovery program requirements included weekly court appearances, intensive outpatient treatment four times a week, AA or NA meetings, and counseling.

During the termination trial, testimony established that Mother was in Phase 2 of her recovery program, with an anticipated completion date between September and December 2026. Mother testified that she had maintained housing at the sober living community, was in full compliance with the facility's alcohol and drug use restrictions, and had made changes in her circumstances. Mother also testified to the hardships she endured prior to her incarceration, detailing a period where she was abruptly evicted and rendered homeless. Recalling the loss of her residence, Mother testified, "It was Easter weekend. He made a point to tell me that it was – he waited to Easter to put me out."

Beyond her housing instability, concerns regarding Mother's psychological well-being remained a significant area of focus in the trial proceedings. During the termination trial, DCS family services worker Ms. Anlexus Hopson testified Mother could not consistently and effectively provide safe and stable care for Violet, in part "[b]ecause

[Mother] has some undiagnosed mental health, and she currently is not on any medication to support her." Mother denied any problem and, accordingly, declined to address these concerns. Mother claimed that her lack of visitation during this time was exacerbated by DCS being short-staffed and her caseworker canceling visits at the last minute. DCS offered evidence to the contrary that it had endeavored to locate Mother and to facilitate visitation. Despite entering formal guilty pleas to multiple felony burglaries, Mother refused to take responsibility for her actions, testifying under oath that she did not commit the crimes. Mother also testified that she and Father were married, but she failed to produce a marriage license or any additional proof to support these statements.

Foster Mother testified as to Violet's advancement while in foster care. Foster Mother testified that Violet "is a rambunctious, strong communicator, she is energetic, she is super loving and affectionate . . . . She is a little love bug. She is just exuberant about the world around her."

On June 20, 2025, the trial court entered a final order terminating the parental rights of both parents. The trial court found that Mother lacked stable housing, as Violet could not reside at the sober living facility, and Mother had no concrete plans for housing after completing the program. The trial court also found that Mother's testimony lacked credibility and that her assertions, including her testimony about her progress, were highly suspect. Although Mother attributed her prolonged absence to her sudden homelessness and alleged DCS scheduling conflicts, the trial court credited DCS's testimony that DCS made reasonable efforts to locate Mother and facilitate visitation. The trial court noted that Violet had remained continuously in foster care since February 2023 and concluded that she was thriving in a pre-adoptive home and had developed a strong, mother-daughter bond with Foster Mother.

Ultimately, the trial court found clear and convincing evidence that Mother abandoned Violet on the grounds of failure to visit, failure to support, and wanton disregard.[3] Additionally, the trial court found that Mother had failed to remedy the persistent conditions that led to Violet's removal and failed to manifest an ability and willingness to assume custody. The trial court further determined that placing Violet in either parent's custody posed a risk of substantial harm and that termination was in the child's best interests. As to Mother, the court found 17 of the 20 statutory factors for assessing Violet's best interest supported termination. The trial court terminated Mother's parental rights.

Mother timely appealed; Father did not appeal. On appeal, Mother contends the

---

[3] The trial court, which had previously granted a default judgment against Father, terminated Father's rights on the grounds of failure to establish parentage and failure to manifest an ability and willingness to assume custody.

- 4 -

trial court erred as to two of the five grounds for termination: the persistence of conditions that led to the child's removal and failure to manifest an ability and willingness to assume custody.  She did not challenge the trial court's best interest analysis.

## II.

Parents have a fundamental constitutional interest in the care and custody of their own children.  *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).  This fundamental interest is "far more precious than any property right."  *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)).  "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference."  *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010).  However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child.  Tenn. Code Ann. § 36-1-113(c)(1)-(2) (effective July 1, 2024, to June 30, 2025)[4]; *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise.  *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d).  "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights."  *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97).  The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings."  *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. Code Ann. § 36-1-113(c).  "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness."  *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## III.

The trial court found that DCS proved five statutory grounds for termination by

---

[4] *See In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

clear and convincing evidence. On appeal, Mother argues the facts were inadequate to support the trial court's findings as to the grounds of persistent conditions and failure to manifest an ability and willingness to assume custody. Mother's arguments on appeal do not address the three grounds of abandonment. Nevertheless, "in parental termination cases in Tennessee 'waiver does not apply in the context of either the grounds for termination or whether termination is in a child's best interest.'" *In re Preston H.*, No. M2022-00786-COA-R3-PT, 2023 WL 6793215, at *16 (Tenn. Ct. App. Oct. 13, 2023), *perm. app. denied* (Tenn. Jan. 24, 2024) (quoting *In re Aniyah W.*, No. W2021-01369-COA-R3-PT, 2023 WL 2294084, at *6 (Tenn. Ct. App. Mar. 1, 2023)). Accordingly, we also consider the abandonment grounds in addition to the challenged grounds. *See* Tenn. Code Ann. § 36-1-113(g)(1) (providing that abandonment as defined in Tennessee Code Annotated section 36-1-102 is a ground for termination).

### A. Abandonment by Failure to Visit

We turn first to the trial court's finding that Mother abandoned Violet by failing to visit prior to Mother's incarceration. Abandonment by an incarcerated parent occurs when a parent who is incarcerated at the time of the petition's filing, or during all or part of the three months preceding the filing, fails to visit or fails to engage in more than token visitation with the child under the age of four for three consecutive months preceding incarceration. Tenn. Code Ann. § 36-1-102(1)(A)(iv)(a)(2) (effective July 1, 2024 through May 4, 2025). In addressing this ground for termination, the trial court found

> [Mother] testified that she was arrested on August 15, 2024, and she did not visit Violet between the period of January 22, 2024, through August 15, 2024. Ms. Hopson testified that [Mother] did not visit Violet in the three months prior to incarceration, specifically she did not visit Violet from April 14, 2024, through August 14, 2024.

The record establishes that Mother was arrested and incarcerated on August 15, 2024, following charges of aggravated burglary and theft. She remained incarcerated when DCS filed the termination petition on October 9, 2024. Because the child was less than four years old at the time the petition was filed, the relevant statutory lookback period is the three consecutive months immediately preceding Mother's incarceration in August 2024. Tenn. Code Ann. § 36-1-102(1)(A)(iv).

During the initial stages of Violet being in the care of Foster Mother, Mother demonstrated a desire to maintain her relationship with the child, visiting consistently throughout 2023 and bringing diapers, wipes, and toys. Things deteriorated, however, in 2024. Mother's in-person visits with Violet ceased following a visit on January 22, 2024, and did not resume until February of 2025. As noted above, the trial court found "[Mother]

- 6 -

did not visit Violet in the three months prior to incarceration."[5]  Although Mother attributed her prolonged absence to her sudden homelessness and alleged DCS scheduling conflicts, the trial court credited DCS's testimony that DCS made reasonable efforts to locate Mother and facilitate visitation.  Despite DCS's efforts to re-engage her, Mother fell out of the child's life for approximately seven months prior to her incarceration.

Accordingly, the trial court's finding that Mother abandoned Violet through her failure to visit by clear and convincing evidence was not in error.

### B.  Abandonment by Failure to Support

The trial court also found that Mother abandoned Violet by failing to provide financial support prior to Mother's incarceration.  In its final order terminating parental rights, the trial court found "by clear and convincing evidence that [Mother] failed to visit or support the child for three months pr[e]ceding incarceration."  Abandonment under this ground for a child less than four years of age occurs when an incarcerated parent fails to provide monetary support or provides only token payments toward the support of the child for the three consecutive months preceding incarceration.  Tenn. Code Ann. § 36-1-102(1)(A)(iv)(a)(2).

The record establishes that Mother was an adult and was therefore presumed to have knowledge of her legal obligation to support the child.  *See* Tenn. Code Ann. § 36-1-102(1)(H).  Because Mother was incarcerated on August 15, 2024, and the child was under four years of age at the time the petition was filed, the determinative three-month statutory lookback period began in May 2024 and continued through August 14, 2024.  *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv)(a)(2).

Mother did not raise her lack of willfulness as an affirmative defense in her answer to the petition to terminate her rights.[6]  Therefore, pursuant to Tennessee Code Annotated section 36-1-102(1)(I), she waived the absence of willfulness as a defense to the grounds of abandonment by failure to visit and failure to support.  *See* Tenn. R. Civ. P. 12.08 (noting that, in general, "[a] party waives all defenses and objections which the party does not

---

[5] The dates used by the trial court show a finding that there was no visitation in the four months preceding Mother's incarceration.  The record shows Mother did not visit Violet at any point between January 22, 2024 and her incarceration in August 2024.

[6]    [I]t shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful.  The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful.  Such defense must be established by a preponderance of evidence.  The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1)(I).

present either by motion as hereinbefore provided, or, if the party has made no motion, in the party's answer or reply, or any amendments thereto.").

It is clear from the record that Mother did not financially support Violet during the relevant lookback period. Ms. Hopson testified on behalf of DCS that Mother provided no financial support to Violet during the relevant lookback period, nor at any point after January 2024. Foster Mother testified that while Mother had previously brought items for the child, she ceased doing so long before the lookback period began. Detailing this timeline, Foster Mother testified, "She would bring some diapers and wipes, sometimes clothing during the 2023 summer especially. . . and then she brought Violet Christmas presents for our last visit which was in January of 2024, and then since then she didn't bring anything except for our visit last week [before trial]."

Ultimately, from our review of the record, we conclude the trial court did not err in finding that Mother abandoned Violet by failing to support her by clear and convincing evidence.

## C. Abandonment by Wanton Disregard

The trial court also found that Mother abandoned Violet by exhibiting a wanton disregard for her welfare. In its final order, the trial court concluded, "Pursuant to T.C.A. § 36-1-113(g)(1) and as defined in T.C.A. § 36-1-102(1)(A), the Court finds by clear and convincing evidence that [Mother] . . . engaged in conduct prior to, during, or after incarceration that exhibited a wanton disregard for the welfare of the child." Abandonment under this ground occurs if a parent, with knowledge of the child's existence, "engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv)(c). This ground for termination "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties." *In re Audrey S.,* 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). The statute does not define "wanton disregard," but this court has repeatedly held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

The record establishes that Mother has a history of alcohol abuse and had pled guilty to driving under the influence on three separate occasions. Crucially, during the underlying dependency and neglect proceedings, the trial court found Mother was charged "with Theft of Property $1,000 - $2,500, Aggravated Burglary — Building, and Theft of Property $1,000 or less." Mother pled guilty to these charges, and the trial court found Mother "testified that she knew that Violet was in foster care when she committed these criminal acts."

- 8 -

The record is replete with evidence of Mother's criminal behavior during 2024, a time when she was fully aware Violet was in foster care. In June 2024, Mother broke into the home of a DCS family support worker while he was away on vacation. Detailing the intrusion and theft, the worker testified, "She told me how she went through my living room window . . . . She told me that she took my laptop and went to the pawn shop and pawned it and got $50 for the laptop." The worker further testified that Mother admitted she "did drink some beers off my bar, and she went to sleep in my house," before stealing "a pillow, a blanket, a suitcase and, of course, she had stole like an old ID of me." A few weeks after the burglary, Mother returned to the worker's home while highly intoxicated. Describing her condition during this second visit, the worker testified that "she was very intoxicated to the point that . . . the police officer actually had to remove her from the steps."

In July 2024, Mother engaged in further criminal conduct. On July 19, 2024, she entered a duplex unit, misrepresented to a neighboring tenant that she resided there, and removed property valued at $1,340. That same day, officers responded to a high school, where they discovered Mother had entered an open locker room and stolen an additional $300 worth of property. These actions culminated in her arrest on August 15, 2024. She subsequently pled guilty in January 2025 to charges of theft of property, aggravated burglary, and burglary of a building.

Mother's pattern of criminal behavior, while her child was in foster care, demonstrates a wanton disregard for her child's well-being. Accordingly, the trial court's finding that Mother abandoned Violet by engaging in conduct that exhibited a wanton disregard for the welfare of Violet by clear and convincing evidence was not in error.

## D. Persistence of Conditions

The trial court found by clear and convincing evidence that the conditions that led to Violet's removal persisted. This ground applies when a child has been removed from a parent's custody for at least six months following a dependency and neglect adjudication, and

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

- 9 -

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A)(i)-(iii).

Here, the trial court found that

the conditions which led to removal from the home or physical or legal custody of the parent still persist and other conditions exist which in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's safe return to the care of [Mother]. Further, there is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to [Mother] in the near future . . .

[DCS family services worker] Ms. Hopson testified that Violet came into custody because of improper guardianship, unstable housing, mother's alcohol dependency, and unsafe environment. Ms. Hopson testified that these conditions still persist as [Mother] does not currently have stable housing and has not shown the Department that she can maintain sobriety while living on her own. [Mother] testified that she currently lives in a sober living community and does not have any plans of where she will live after she is released from the sober living community. [Mother] testified that she does not have a time frame of when she will be released and that there would be no place for Violet to sleep in her current living environment. [Mother] testified that it would be possibly six months before she would be ready to have Violet back in her custody . . . . The Court finds that by mother's testimony she has at least one year before she is completed with [the] recovery program.

On appeal, Mother contends that the trial court erred in terminating her rights on the persistent conditions ground because she has cured the conditions that originally led to Violet's removal. She points to her testimony that she has maintained housing in a sober living community, has been in full compliance with the facility's alcohol and drug restrictions, and has fostered significant changes in her circumstances through her participation in a mandatory recovery program. In response, DCS argues that the conditions necessitating the child's foster-care placement persist, noting that Mother's sobriety has only been maintained within the highly controlled environment of the recovery court program and sober living facility.

The record supports the trial court's findings. Violet was removed from Mother's

care in February 2023 and adjudicated dependent and neglected in October 2023 due to Mother's "alcohol dependency, inadequate parenting, and housing instability." While Mother's recent steps toward sobriety within her mandatory program are commendable, she still lacks a stable home where the child can reside. Mother currently resides in an extended sober living facility that does not permit children. Furthermore, Mother testified that she will not complete this mandatory recovery program until mid-to-late 2026, and she currently has no credible plan for independent housing once she departs. Further, Mother admitted she would need a "transitional period" of gradually increasing visitation before she would be capable of assuming full custody of the child.

A critical indicator of whether conditions have been remedied is a parent's ability to take responsibility for their actions. *In re Dakota C.R.*, 404 S.W.3d 484, 501 (Tenn. Ct. App. 2012); *see also In re Emily N.I.,* No. E2011-01439-COA-R3-PT, 2012 WL 1940810, at *18 (Tenn. Ct. App. May 30, 2012) (holding that because "[n]either parent accepted full responsibility for their actions . . . there was little likelihood that the conditions prohibiting the return of the Children would be remedied"). The record establishes that Mother continues to deny her history of alcohol abuse and criminal behavior. Despite her formal guilty pleas to multiple offenses, she testified at trial that she was incarcerated for a "crime that [she] did not commit." Her refusal to take responsibility for the criminal conduct suggests little likelihood that the conduct will be remedied. *See In re Porcalyn N.*, No. E2020-01501-COA-R3-PT, 2021 WL 2026700, at *9 (Tenn. Ct. App. May 21, 2021).

In addition to her lack of housing, testimony was presented that Mother has lingering, unaddressed mental health issues that prevent safe reunification. The record establishes that Mother was involuntarily committed to mental health facilities on two separate occasions; first by law enforcement during the child's initial removal, and later by a criminal court order for a forensic evaluation. Furthermore, the record demonstrates that Mother has failed to appropriately manage her symptoms following these involuntary commitments. A DCS family services worker testified to concerning text messages sent by Mother including messages threatening suicide. Mother also asserted that someone was hacking her phone, watching her apartment, and tracking the Foster Mother's whereabouts. Rather than seeking assistance, Mother dismissed these incidents as a mere "situational crisis" and insisted "there's nothing wrong with me mentally." Because Mother refuses to acknowledge her psychological needs and "currently is not on any medication to support her diagnosis," DCS raised concerns that Mother's mental and emotional fitness would be detrimental to the child. The trial court agreed, concluding that Mother "has difficulty understanding some of the circumstances she has been placed in" and remains mentally and emotionally unfit to parent.

Finally, the persistence of conditions statute requires a finding that continuing the parent-child relationship would greatly diminish the child's chances of early integration into a safe, stable, and permanent home. Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). The trial court found "the continuation of the legal parent and child relationship greatly

diminishes the child's chances of early integration into a safe, stable and permanent home." The record demonstrates that Violet has remained continuously in foster care for nearly two-and-a-half years, where she is currently thriving in a stable, pre-adoptive home and has developed a mother-daughter bond with Foster Mother. Given Mother's lack of independent housing, continued denial of culpability, unaddressed mental health issues, and the prolonged timeframe required before she could even attempt to parent, there is little likelihood that these conditions will be remedied at an early date. Accordingly, despite Mother's progress, we conclude the trial court's finding that the conditions which led to Violet's removal still persist by clear and convincing evidence was not in error.

### E. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court also found by clear and convincing evidence that Mother failed to manifest an ability and willingness to assume custody of the child. This ground requires the petitioner to prove by clear and convincing evidence that the parent has "failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

> [The] two prongs must be proven by clear and convincing evidence to terminate parental rights under this statute: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

The Tennessee Supreme Court has indicated that the statute places a "conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Failure of the parent to manifest either ability or willingness will satisfy the first prong. *Id.* "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome . . . obstacles" preventing the parent from assuming custody. *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). A parent's express desire to reunite with the child is insufficient to establish a willingness to assume custody. *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019). To the contrary, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). This court considers a parent's efforts to overcome any obstacles standing in the way of assuming custody or financial responsibility. *In re Jaxx M.*, No. E2018-

- 12 -

01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (citing *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). A failure to make efforts to overcome such obstacles "can undercut a claim of willingness." *Id.* As for the second prong, a substantial risk of harm requires "a real hazard or danger that is not minor, trivial, or insignificant" and requires the harm to be more than a "theoretical possibility" but rather to be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018).

On appeal, Mother contends that the trial court erred in terminating her rights on this ground because the court only explicitly found that she lacked the ability to reassume custody but made no specific factual finding regarding her willingness to do so. In support of her willingness, Mother points to her meaningful participation in a substance abuse recovery program, her establishment of housing under that program, and her compliance with the tasks presented to her by DCS.

Mother's argument misapprehends the statute. Because the law requires a parent to manifest both an ability and a willingness, DCS need only prove that Mother failed to manifest one or the other. Accordingly, even assuming *arguendo* that Mother possesses a willingness to parent the child, as noted above, the first prong of this ground is a conjunctive obligation where failing either the ability or willingness prong satisfies the first part of the test for this termination ground. *See In re Neveah M.*, 614 S.W.3d at 677 (holding that the first element of the statute is satisfied if the petitioner proves by clear and convincing evidence that the parent has failed to manifest either ability or willingness).

Mother's current lifestyle and circumstances demonstrate an inability to assume custody. Mother conceded this reality during her testimony, acknowledging that her current sober living arrangement provides nowhere for Violet to sleep and that Mother has no credible housing plan upon her anticipated release in late 2026. The trial court also expressed concerns about Mother's ability to parent, citing her lack of established sobriety outside of a rehabilitation center combined with her failure to take responsibility for her actions and unaddressed mental health problems. The trial court did not err in finding that the first element of this ground was met.

Because the first element is met, we must next assess whether placing Violet in Mother's custody would pose a risk of substantial harm to her physical or psychological welfare. *See* Tenn. Code Ann. § 36-1-113(g)(14). This court has concluded that a parent's "significant, recent history of substance abuse [or] mental illness," alongside repeated criminal conduct requiring incarceration, supports a finding of substantial harm. *In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021). Furthermore, forcing a child to transition from the only stable home they have ever known into the custody of a parent with whom they share no meaningful bond can

- 13 -

pose a risk of substantial psychological harm. *See In re Draven K.*, No. E2019-00768-COA-R3-PT, 2020 WL 91634, at *14 (Tenn. Ct. App. Jan. 7, 2020).

The record demonstrates that returning the child to Mother's care at this juncture would pose a risk of substantial harm to the physical or psychological welfare of the child. Mother lacks a credible plan for providing a safe home for Violet, and the trial court was unpersuaded that she had made a lasting change with regard to her sobriety. On this latter point, Mother has failed to take responsibility for her actions. With regard to psychological harm, the parent-child bond has deteriorated, and Violet does not have a healthy parent-child attachment with Mother. Mother missed seven consecutive months of visits prior to her incarceration and managed only three visits following her release. Foster Mother testified as to the adverse emotional reaction the child had to seeing Mother.

Accordingly, the record provides clear and convincing evidence in support of the trial court's finding of Mother's failure to manifest an ability and willingness to assume custody.

IV.

Having concluded that at least one statutory ground for termination of parental rights has been shown by clear and convincing evidence, this court's focus shifts to what is in Violet's best interest. *See In re Audrey S.*, 182 S.W.3d at 877. While Mother did not contest the trial court's best interest analysis, this court is required, nevertheless, to review the trial court's findings as to the best interest of the child. *In re Carrington H.*, 483 S.W.3d at 524.

The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

The nonexclusive factors relevant to the best interest analysis are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons

- 15 -

other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial

support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1).

The trial court's findings regarding the best interest factors were as follows:

a) Pursuant to T.C.A. § 36-1-113(i)(1)(A), termination of parental rights will allow for Violet's critical need for stability to be met and allow for continuity of placement throughout her minority. [DCS family services worker] Ms. Hopson testified that Violet is in a pre-adoptive home with [Foster Mother] and all her needs are being met. Termination of parental rights furthers the adoption process for Violet and allows her to continue in the same home she has been residing. This step is the first step in moving the child towards adoption by the foster parent. The Court finds this factor favors termination of Respondents' parental rights.

b) Pursuant to T.C.A. § 36-1-113(i)(1)(B), a change of caretakers and physical environment is likely to have a negative effect on the child's emotional, psychological, and medical condition. Ms. Hopson testified that changing caregivers at this stage of Violet's life would have a detrimental effect on her because Violet does not know [Mother] or [Father], the only person she knows as her parent is [Foster Mother]. The Court finds this factor favors termination of Respondents' parental rights.

c) Pursuant to T.C.A. § 36-1-113(i)(1)(C), the mother and the father have not demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs. Ms. Hopson testified that [Mother] and [Father] have not demonstrated continuity and stability in meeting Violet's basic material, educational, housing, and safety needs. . . . Ms. Hopson testified that [Mother] has not maintained stability for herself. [Mother] testified that she was incarcerated in August of 2024 and served more than five months in jail before being released into an alcohol treatment program through Drug Court. The Court finds this factor favors termination of Respondents' parental rights.

d) Pursuant to T.C.A. § 36-1-113(i)(1)(D), the mother, the father, and the child do not have a secure and healthy parental attachment, and there is not a reasonable expectation that the mother and father can create such attachment. Ms. Hopson testified that Violet does not have a secure and

healthy parental attachment with [Mother] and [Father]. Ms. Hopson testified that . . . Violet does not ask about nor talk about [Mother] or [Father]. [Foster Mother] testified that Violet does not ask nor talk about [Mother]. The Court finds this factor favors [termination.]

e) Pursuant to T.C.A. § 36-1-113(i)(1)(E), the mother and the father have not maintained regular visitation or other contact with the child and did not use the visitation or other contact to cultivate a positive relationship with the child. . . . Ms. Hopson . . . testified that [Mother] last visited Violet on June 22,[7] 2024, prior to her incarceration. Ms. Hopson testified that [Mother] has only had three visits with Violet since February 2025, when she was released from incarceration. [Foster Mother] testified that [Mother] was consistently visiting Violet in 2023 but stopped visiting in January of 2024. [Foster Mother] testified that there have been a few visits since [Mother] has been released from incarceration. The Court finds this factor favors termination of Respondents' parental rights.

f) Pursuant to T.C.A. § 36-1-113(i)(1)(F), there is no proof that the child is fearful of living in the home of her mother or father. The Department offered no proof that the child is fearful of living in the home of her mother or father. The Court makes no finding that the child is fearful of living in the home of her mother or father.

g) Pursuant to T.C.A. § 36-1-113(i)(1)(G), there is no proof that the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms. The Department offered no proof that the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms. The Court makes no finding that . . . the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms.

h) Pursuant to T.C.A. § 36-1-113(i)(1)(H), the child has created a healthy parental attachment with another person or persons in the absence of the mother and the father. Ms. Hopson testified that Violet has a strong bond with [Foster Mother]. Ms. Hopson testified that Violet and [Foster Mother] have a loving mother and daughter like relationship. [Foster Mother] testified that Violet calls her "mommy" or "mama" and they have a close

---

[7] In its final order evaluating the best interest factors, the trial court noted Ms. Hopson testified Mother last visited the child on June 22, 2024. However, the court found elsewhere that Mother stopped visiting in January 2024, and in any event, the record preponderates against this finding. The transcript establishes that Ms. Hopson actually testified Mother's last visit prior to her incarceration was January 22, 2024.

relationship, they are very connected, and they do a lot in the community. [Foster Mother] testified they have a playful; structured; warm; and loving bond and they get joy from each other. The Court finds this factor favors termination of Respondents' parental rights.

i) Pursuant to T.C.A. § 36-1-113(i)(1)(I), the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings. [Foster Mother] testified Violet has a close relationship with [Foster Mother]'s extended family, specifically her mother and her siblings. [Foster Mother] testified that they see them often. Ms. Hopson testified that [Foster Mother] is part of a foster care support group and Violet has strong bonds with the other children in the support group. The Court finds this factor favors termination of Respondents' parental rights.

j) Pursuant to T.C.A. § 36-1-113(i)(1)(J) the mother and the father have not demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in their homes. Ms. Hopson testified that [Mother] and [Father] have not demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in their homes. . . . [Mother] testified that her current circumstances prevent Violet from living with her. The Court finds this factor favors termination of Respondents' parental rights.

k) Pursuant to T.C.A. § 36-1-113(i)(1)(K), the mother and the father have not taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions. . . . Ms. Hopson testified that in the last five months [Mother] has completed a parenting assessment and a mental health assessment. The Court finds this factor favors termination of Respondents' parental rights.

l) Pursuant to T.C.A. § 36-1-113(i)(1)(L), the child is in the custody of the Department, and the Department has made reasonable efforts to assist the mother and the father in making a lasting adjustment. Ms. Hopson testified that when the whereabouts of the parents were unknown the Department made diligent efforts to locate them. Ms. Hopson testified that the Department mailed letters to last known addresses and completed internet searches for them. Ms. Hopson testified that she put in case services for alcohol and drug assessment and provided [Mother] with housing resources and scheduled visitations. The Court finds this factor favors termination of Respondents' parental rights.

m) Pursuant to T.C.A. § 36-1-113(i)(1)(M), the mother and the father have

- 19 -

not demonstrated a sense of urgency in establishing paternity to the child, seeking custody of the child or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest. . . . [Mother] testified that her current circumstances prevent her from assuming custody of Violet. The Court finds this factor favors termination of Respondents' parental rights.

n) Pursuant to T.C.A. § 36-1-113(i)(1)(N), the mother, the father, or other person residing with or frequenting the home of the mother or father, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult. [Mother] testified that her previous paramours abused her older children. The Court finds this factor favors termination of [Mother]'s parental rights.

o) Pursuant to T.C.A. § 36-1-113(i)(1)(O), the mother and the father have not ever provided safe and stable care for the child or any other child. [Mother] testified that she has two other children and does not have custody of them. Ms. Hopson testified that [Mother] and [Father] have never provided safe and stable care for Violet or any other child. The Court finds this factor favors termination of Respondents' parental rights.

p) Pursuant to T.C.A. § 36-1-113(i)(1)(P), the mother and the father have not demonstrated an understanding of the basic and specific needs required for the child to thrive. . . . Ms. Hopson testified that [Mother] has not demonstrated an understanding of the basic and specific needs required for the child to thrive. The Court finds that mother has difficulty showing she understands Violet's needs; mother showed she has an idea of what she thinks would be good for Violet, but her actions show a lack of understanding. The Court finds this factor favors termination of Respondents' parental rights.

q) Pursuant to T.C.A. § 36-1-113(i)(1)(Q), the mother and the father have not demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive. Ms. Hopson testified that [Mother] and [Father] have not demonstrated the ability of maintaining a home that meets Violet's basic and specific needs and in which she can thrive. . . . [Mother] testified that she is currently living in a sober living community and Violet is unable to live with her at this time and does not have a plan for Violet after she is released. The Court finds this factor favors termination of Respondents' parental rights.

r) Pursuant to T.C.A. § 36-1-113(i)(1)(R), there is no proof that the physical environment of mother's home is unhealthy and not safe for the child. The

Department offered no proof that the physical environment of mother's homes is unhealthy and not safe for the child. The Court makes no finding that the physical environment of mother's homes is unhealthy and not safe for the child.

. . .

t) Pursuant to T.C.A. § 36-1-113(i)(1)(S), the mother and the father have not consistently provided more than token financial support for the child. . . . [Foster Mother] testified that [Mother] brought Violet diapers and wipes during her visits in 2023. [Foster Mother] testified that [Mother] brought snacks to the visit in January of 2024. [Foster Mother] testified that at the most recent visit [Mother] brough[t] Violet a small compass and some toys. The Court finds the actions of [Mother] thoughtful, but [they] do not constitute support. This factor favors termination of Respondents' parental rights.

u) Pursuant to T.C.A. § 36-1-113(i)(1)(T), the mental or emotional fitness of mother and the father would be detrimental to the child or prevent mother from consistently and effectively providing safe and stable care and supervision of the child. Ms. Hopson testified the mental or emotional fitness of [Mother] would be detrimental to Violet because [Mother] sent Ms. Hopson text[] messages threatening suicide due to Violet being in state custody and has undiagnosed mental health issues. . . . The Court finds that mother has difficulty understanding some of the circumstances she has been placed in and her mental and emotional fitness would be detrimental to the child. The Court finds the father not mentally or emotionally fit to care for the child. This factor favors termination of the Respondents' parental rights.

Ultimately, the trial court found by clear and convincing evidence that "it is in the best interest of the child that parental rights be terminated."

In considering this decision, the determination of a child's best interest "may not be reduced to a simple tallying of the factors for and against termination." *In re Chayson D.*, 720 S.W.3d 123, 146 (Tenn. Ct. App.2023). Rather, a court must determine, after completing a holistic assessment of the record, whether terminating a particular parent's rights would be in a particular child's best interest. *Id.* As many of the factors touch on similar factual predicates and involve similar issues, we group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case. *Id.* at 144.

The correctness of the trial court's ultimate assessment and the thrust of its analysis are well-reasoned and plainly supported by the record. Violet is a child who requires

stability and a safe environment after being removed from Mother's care at 13 months old due to Mother's alcohol dependency and Violet's exposure to an unsafe environment. With the love, support, and care of her foster family, Violet is thriving and having her needs met in this foster home. A close attachment has developed between Violet and Foster Mother, whom she affectionately calls "momma," as well as with the extended foster family in this pre-adoptive home. Meanwhile, Mother has failed to visit or financially support Violet for extensive periods. As found by the trial court, Violet does not ask about or talk about Mother, and Foster Mother testified that the child struggled with sleep and daycare drop-offs following those interactions. There is not a healthy parent child relationship between Mother and Violet, and the trial court's understanding that such a relationship is not likely to develop is supported by the record. *In re Ka'Myiah M*., No. M2024-01421-COA-R3-PT, 2025 WL 3643403, at *19 (Tenn. Ct. App. Dec. 16, 2025) (noting that "[t]his court has repeatedly indicated that '[o]ften, the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest.'").[8]

Regarding understanding Violet's needs and ensuring that she receives appropriate care, Mother remains unequipped to house the child and lacks a practical understanding of what Violet requires to thrive. Additionally, rather than remedying the conditions that led to Violet's removal and avoiding criminal wrongdoing, Mother engaged in a string of burglaries during the summer of 2024, leading to her extended incarceration, and she continues to struggle with issues that have rendered her emotionally unstable. Mother indicated she would need a "transitional period" of gradually increasing visitation before she would be capable of assuming full custody of the child. The trial court properly concluded that placing Violet in her care would pose a risk of substantial harm to the child's welfare. We do not question or doubt that Mother loves Violet and desires to be with her, but her criminal actions and failure to take responsibility for her actions simply do not correspond with this aspiration. It is the best interest of the child and not the parent that is to be considered, and the circumstances of the present case generate an overwhelming sense that Violet's life will not be improved by a reintroduction to Mother. *See In re Chayson D*., 720 S.W.3d at 146.

While there are individual factors as to which the trial court's analysis could be questioned, the correctness of the trial court's ultimate assessment and the thrust of its analysis is well-reasoned and plainly supported by the record. We conclude the trial court properly determined that clear and convincing evidence supports the conclusion that it is in Violet's best interest to terminate Mother's parental rights. Accordingly, we affirm the termination of Mother's parental rights.

---

[8] *See also*, *e.g.*, *In re Krisley W*., 2023 WL 2249891, at *11; *In re Charles B*., No. W2020-01718-COA-R3-PT, 2021 WL 5292087, at *11 (Tenn. Ct. App. Nov. 15, 2021); *In re Lauren F*., No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *14 (Tenn. Ct. App. Nov. 10, 2021); *In re Christopher L*., No. M2020-01449-COA-R3-PT, 2021 WL 4145150, at *9 (Tenn. Ct. App. Sept. 13, 2021); *In re Miley D*., No. M2020-01416-COA-R3-PT, 2021 WL 2948776, at *6 (Tenn. Ct. App. July 14, 2021); *In re Cortez P*., No. E2020-00219-COA-R3-PT, 2020 WL 5874873, at *12 (Tenn. Ct. App. Oct. 2, 2020).

V.

      In considering the arguments advanced on appeal and for the reasons discussed above, we affirm the judgment of the trial court.  The costs of the appeal are taxed to the appellant, Anna L., for which execution may issue if necessary.  The case is remanded for such further proceedings as may be necessary and consistent with this opinion.


s/ Jeffrey Usman
JEFFREY USMAN, JUDGE